IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

INTEGRIS HEALTH, INC., a not-for-profit Oklahoma corporation, and INTEGRIS BAPTIST MEDICAL CENTER, a not-for-profit Oklahoma corporation,

        Plaintiffs,

vs.

CHARTIS CLAIMS, INC., a foreign corporation; COVENTRY HEALTH AND LIFE INSURANCE CO., a foreign corporation, and INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, INC., a foreign corporation,

        Defendants.

Case No. CIV-12-0346-C

## MEMORANDUM OPINION AND ORDER

Plaintiffs Integris Health, Inc., and Integris Baptist Medical Center (collectively "Integris") filed this breach of contract action in state court against Chartis Claims, Inc.,[1] Coventry Health and Life Insurance Co. ("Coventry"), and Insurance Company of the State of Pennsylvania, Inc. ("ICP").[2] Plaintiffs and Defendants Coventry and ICP have filed cross-motions for summary judgment pursuant to Fed. R. Civ. P. 56. In each Motion the parties argue that the undisputed material facts entitle them to judgment.

---

[1] Chartis was previously dismissed from the lawsuit. (Dkt. No. 36.)

[2] The Insurance Company of the State of Pennsylvania removed the case on the basis of diversity jurisdiction.

## BACKGROUND[3]

Plaintiffs entered into a Participating Hospital Agreement ("Agreement") with Coventry to provide health care services to subscribers of Coventry's insurance or health plan products. Coventry and Chartis are parties to a Managed Care Services Agreement, which gave Chartis, as a claims administrator, access to Coventry's managed care services, including its networks of contract providers. ICP, a "Payor" under the terms of the Agreement, also contracted with Coventry to gain access to its provider network.

ICP issued a worker's compensation policy to E-Frac, whose employee, Michael Morris, was seriously injured while on the job in Texas. Mr. Morris was initially transported to a regional hospital in Shattuck, Oklahoma. However, due to the severity of his injuries, Mr. Morris was airlifted to Plaintiffs' hospital in Oklahoma City. During his recovery, Mr. Morris sought and was awarded benefits by the Texas Workers' Compensation Commission. Mr. Morris's treatment at Plaintiffs' hospital resulted in $1,509,395.56 in medical bills. Under the Texas' Workers' Compensation fee schedule ("Texas fee schedule"), the maximum allowable reimbursement for the health care services Plaintiffs provided Mr. Morris was $420,91.54. The maximum reimbursable amount under the Oklahoma Worker's Compensation fee schedule ("Oklahoma fee schedule") was $1,056.576.89.

Plaintiffs submitted claims to Chartis, ICP's claims administrator, seeking payment for Mr. Morris's health care costs. Chartis applied the Texas fee schedule to the bills and

---

[3] These facts are taken principally from the parties' Joint Stipulation of Facts (Dkt. No. 47).

then transmitted its fee determination and the bill details to Coventry. As authorized by the Agreement with Plaintiffs, Coventry applied an additional 13% discount to the billed charges, resulting in a payment amount of $365,566.64. That amount was tendered to Plaintiffs as payment in full for the services provided to Mr. Morris. Plaintiffs objected to the fee calculation and appealed the benefits decision. When their appeal was unsuccessful, Plaintiffs filed this lawsuit, alleging Defendants breached the Agreement. The parties agree that Oklahoma law applies to the Agreement.

## STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings and affidavits show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[A] motion for summary judgment should be granted only when the moving party has established the absence of any genuine issue as to a material fact." Mustang Fuel Corp. v. Youngstown Sheet & Tube Co., 561 F.2d 202, 204 (10th Cir. 1977). The movant bears the initial burden of demonstrating the absence of material fact requiring judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is material if it is essential to the proper disposition of the claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If the movant carries this initial burden, the nonmovant must then set forth "specific facts" outside the pleadings and admissible into evidence which would convince a rational trier of fact to find for the nonmovant. Fed. R. Civ. P. 56(e). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." Celotex, 477 U.S. at

324. Such evidentiary materials include affidavits, deposition transcripts, or specific exhibits. Thomas v. Wichita Coca-Cola Bottling Co., 968 F.2d 1022, 1024 (10th Cir. 1992). "The burden is not an onerous one for the nonmoving party in each case, but does not at any point shift from the nonmovant to the district court." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 672 (10th Cir. 1998). All facts and reasonable inferences therefrom are construed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## ANALYSIS

This case is a contract dispute and as noted above is governed by Oklahoma law. Thus, as stated by the Oklahoma Supreme Court:

> The following elementary rules of contract law are applicable here. The courts will read the provisions of a contract in their entirety, Mortgage Clearing Corp. v. Baughman Lumber Co., 1967 OK 232, ¶ 11, 435 P.2d 135, 138, to give effect to the intention of the parties as ascertained from the four corners of the contract, and where the language is ambiguous, it will be interpreted in a fair and reasonable sense. Id., at ¶ 13, 435 P.2d at 139; 15 O.S.2001, §§ 155 and 157. The courts will read the contract language in its plain and ordinary meaning unless a technical meaning is conveyed. Pitco Production Co. v. Chaparral Energy, Inc., 2003 OK 5, ¶ 14, 63 P.3d 541, 545–546. The courts will decide, as a matter of law, whether a contract provision is ambiguous and interpret the contract provision as a matter of law, id., at ¶ 12, 63 P.3d at 545, where the ambiguity can be cleared by reference to other provisions or where the ambiguity arises from the contract language and not from extrinsic facts. Paclawski v. Bristol Laboratories, Inc., 1967 OK 21, ¶ 24, 425 P.2d 452, 456.

Oklahoma Oncology & Hematology, P.C. v. U.S. Oncology, Inc., 2007 OK 12, ¶ 27, 160 P.3d 936, 946 (footnote omitted). "[T]he test to be applied in determining whether a word [or phrase] is ambiguous is whether the word [or phrase] 'is susceptible to two

4

interpretations' on its face." Cranfill v. Aetna Life Ins. Co., 2002 OK 26, ¶ 7, 49 P.3d 703, 706 (quoting Littlefield v. State Farm Fire & Cas. Co., 1993 OK 102, ¶ 7, 857 P.2d 65, 69). The test "is applied from the standpoint of a reasonably prudent lay person, not from that of a lawyer." Cranfill, 2002 OK 26, ¶ 8, 49 P.3d at 706 (citing Couch on Insurance 3d § 21:14 (1995)). With these standards in mind, the Court turns to the two disputes at issue.

At its core this dispute centers on whether the payment made to Plaintiffs for the medical care provided to Mr. Morris was proper under the Agreement. Before addressing that issue, the Court must resolve a question regarding the proper Defendants. According to Defendant Coventry, it cannot be held liable to Plaintiffs because the Agreement specifically provides that, when it is not the Payor, it is not obligated to pay for covered services rendered to a member. Thus, Coventry argues, because it was not a "Payor" it cannot be said to have breached the Agreement.

The Agreement provides that "[w]hen a Coventry Company is not the Payor, Payor, not Health Plan or a Coventry Company, shall have the obligation and liability to Hospital with respect to any claim or fee for health care services relating to or arising under the Agreement." (Pls.' Mtn. Summ. J., Dkt. No. 50, Ex. 1, ¶ 3.3.) Payor is defined as "[a]n entity authorized by a written contract with Health Plan or Coventry Company to access one or more networks of Participating Providers and who or which is liable for funding or underwriting benefit payments under a Member Contract, which entity has a financial responsibility to pay for Covered Services rendered to Members." Id. at ¶ 1.9. The parties also stipulated that "[u]nder the terms of [the Participating Hospital and Managed Care

5

Services] agreements, the Insurance Company of the State of Pennsylvania . . . has the sole obligation to make payment to Plaintiffs, as the providers of health care services to subscribers of Coventry's insurance or health plan products." (Jt. Stip., Dkt. No. 47, ¶ 1.) Thus, under the terms of the Agreement and the Joint Stipulation, Coventry was not a "Payor."

Plaintiffs attempt to avoid the effect of these provisions by asserting that:

Section 3 of the Agreement describes instances where Coventry, referred to within the Agreement as "Health Plan," "may reduce or deny payment" under certain circumstances, and must make payments to INTEGRIS in certain circumstances, indicating Coventry *did* have the power under the contract to control payments to INTEGRIS and was under an obligation to make certain payments to INTEGRIS.

(Pls.' Resp., Dkt. No. 63, p. 5.) However, when the provision relied on, ¶ 3.1.4, is read in context, it is clear that Coventry may reduce or deny payment only when it is the Payor. [4] Plaintiffs also cite ¶¶ 3.1.5[5] and 3.1.6[6], as "indicat[ing] that *either* a payor *or* Coventry were

---

[4] Paragraph 3.1.4 states:
Health Plan and Payors may reduce or deny payment for services which are not submitted for payment in accordance with the provisions of Section 2.6 or which are not billed or coded in accordance with generally accepted industry standards for hospital billing and coding practices. Health Plan and Payors may require appropriate documentation and coding to support payment for Covered Services. Hospital shall have the opportunity to correct any billing or coding error within sixty (60) days of denial related to any such claim submission.

[5] Paragraph 3.1.5 states:
Notwithstanding anything in this Agreement to the contrary, in those instances where an audit of medical records is desired by Health Plan or Payor, Health Plan or Payor shall first pay Hospital one hundred percent (100%) of the applicable rates set forth in Exhibits A or B within the time period stated herein. Written notice of Health Plan or Payor's intent to audit a claim shall be received by Hospital no later than sixty (60) days following the final payment date. If

responsible for payments to INTEGRIS." (Pls.' Resp., Dkt. No. 63, p. 23.) When those paragraphs are read in their entirety, it is clear neither supports Plaintiffs' position.

In light of the unambiguous terms of the Agreement pertaining to when Coventry is obligated to pay Plaintiffs,[7] coupled with the parties' stipulation, the Court concludes Coventry did not breach the Agreement by failing to pay Plaintiffs the amount they claim is owed for services provided to Mr. Morris because Coventry was not a "Payor" as that term

---

notification is not received within said time, then no audit will be allowed and the claim will be considered closed. All audits must be completed within six (6) months of the final billing date. Health Plan and Payors agree to comply with Hospital's policies and procedures pertaining to the audit of claims.

[6] Paragraph 3.1.6 states:
    Either Party shall be entitled to request an adjustment of payment if, within three hundred and sixty-five (365) days from the date of payment, it notifies the other Party in writing of the incorrect payment and provides documentation substantiating such claim. Hospital shall refund Health Plan or Payor the amount of overpayment within thirty (30) days after receipt of a request for refund, or shall respond with detail within said time if Hospital disputes the refund request. Health Plan or Payor shall pay to Hospital the amount of any underpayment within thirty (30) days after receipt of a request for additional payment, or shall respond with detail within said time if Health Plan or Payor disputes the request for additional payment. If either Party disputes the request for adjustment of payment as specified herein, the Parties shall work cooperatively and in good faith to resolve the payment issue on an informal basis within sixty (60) days of the first notification of a request for adjustment of payment. If the Parties' attempts to resolve the issue are unsuccessful, then any disputes concerning claims of incorrect payment shall be resolved in accordance with the Dispute Resolution provisions of Section 6.4. In no event shall Health Plan or Payor offset overpayments against, or deduct overpayments from, any other payments due and owing to Hospital.

[7] Plaintiffs' reliance on extrinsic evidence to show that "Coventry does play a role in processing invoices from medical care providers on behalf of insurers that are Coventry's clients" (Dkt. No. 63, p. 25), is inadmissible, as the pertinent terms of the contract are unambiguous. Even if that evidence could be considered, while it may show that Coventry helped determine the amount Plaintiffs were paid for services provided to Mr. Morris, it does not show that Coventry had any contractual obligation to pay Plaintiffs for those services.

is used in the Agreement. Therefore, Coventry's Motion for Summary Judgment will be granted.

Now to the core dispute in this action – What is the proper amount of payment due under the Agreement for the medical treatment provided to Mr. Morris? Key to deciding this question is determining what State's law applies to determine the amounts due under the Agreement.

Plaintiffs argue that the terms of the Agreement restrict the applicable law to Oklahoma. Plaintiffs' position hinges on their interpretation of ¶ 6.11 of the Agreement, which states: "The Agreement shall be governed by and construed in accordance with the laws of the State of Oklahoma without regard to such State's choice of law provisions." (Dkt. No. 50, Ex. 1, ¶ 6.11.). Relying on this interpretation, Plaintiffs assert that ICP should have paid the sum of $919,221.89. Plaintiffs reach this figure by applying the Oklahoma Workers' Compensation fee schedule to the billed charges and then reducing that amount by the 13% contract discount.[8] For its part, ICP relies on another provision of the Agreement in determining its obligation. That provision states:

> The amount payable under the terms of this Contract shall be the lesser of the Contract rate, billed charges, or a 13% discount from the amount payable under guidelines established under **any State law** or regulation pertaining to health care services rendered for occupationally ill/injured employees.

---

[8] Alternatively, they claim they are entitled to the sum of $1,509,395.56, the full value of the services rendered pursuant to ¶ 3.1.1 of the agreement, which allows them to "refuse to honor the contract rates if Payor does not pay Clean claims" within the time frame set by state law.

8

Id. at Exhibit B-1, Note 1 (emphasis added).

Thus, the Court's task is to examine the Agreement, determine if it is ambiguous, and if not, apply the terms of the Agreement. "'A contract is ambiguous if it is reasonably susceptible to at least two different constructions. To decide whether a contract is ambiguous [the Court] look[s] to the language of the entire agreement. A contract must be considered as a whole so as to give effect to all its provisions.'" Eureka Water Co. v. Nestle Waters N. Am., Inc., 690 F.3d 1139, 1149 (10th Cir. 2012) (quoting Pitco Prod. Co. v. Chaparral Energy, Inc., 2003 OK 5, ¶ 14, 63 P.3d 541, 545-46 (Okla. 2003)). "[E]xtrinsic evidence is not admissible to create an ambiguity in a contract that is unambiguous on its face." Id.

After consideration of the Agreement as a whole the Court finds it is not ambiguous. The operative terms of the Agreement are clear and when read in its entirety the Agreement is susceptible to only one meaning. Of particular import in resolving the present dispute is the phrase "any State law." Plaintiffs argue the "State" portion of this phrase is limited to Oklahoma law by operation of ¶ 6.11. Plaintiffs argue that ¶ 6.11 provides the Agreement would be "governed by and construed in" accordance with Oklahoma law, and because the Agreement defines "State" as the State of Oklahoma, the operative phrase should be read as any Oklahoma law.

Plaintiffs' construction fails for two reasons. First, the Court finds no support for Plaintiffs' argument that the parties intended the term "State" when used in the Agreement to mean the "State of Oklahoma." "State" is not a defined term in the Agreement. Rather, its meaning must be determined from usage in the entire contract. See 15 Okla. Stat. § 157

9

("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others."). Where the parties were identifying a particular State such as Oklahoma, they used the phrase "State of Oklahoma." In other instances, the terms "State" is used in its general sense. Moreover, the Agreement does not require the term "State," when used in Note 1, to mean Oklahoma. To accept Plaintiffs' construction would require the Court to rewrite the Agreement, an act prohibited by Oklahoma law. See JPMorgan Chase Bank, N.A. v. Specialty Rests., Inc., 2010 OK 65, ¶ 9, 243 P.3d 8, 13 ("Absent illegality, the parties are free to bargain as they see fit, and this Court will neither make a new contract or rewrite existing terms.").

In short, considering the Agreement in its entirety, the Court concludes the language in Note 1 is not ambiguous. The phrase "any State law" means exactly what it says, the law of any state of the United States. As Texas is a "State," ICP properly applied its law in determining the amount due to Plaintiffs. Therefore, ICP is entitled to summary judgment.

For the reasons set forth herein, Defendant Coventry Health and Life Insurance Co.'s Motion for Summary Judgment (Dkt. No. 51) is GRANTED. Likewise, Defendant Insurance Company of the State of Pennsylvania, Inc.'s Motion for Summary Judgment (Dkt. No. 52) is GRANTED. Plaintiffs' Motion for Summary Judgment (Dkt. No.50) is DENIED. A separate judgment will issue.

IT IS SO ORDERED this 18th day of June, 2013.

ROBIN J. CAUTHRON
United States District Judge